1  PETER GOLDSTEIN, SBN 123111
   LAW OFFICES OF PETER GOLDSTEIN
2  312 West Fifth Street, Suite 1002
   Los Angeles, California 90013
3  Telephone:(213) 630-2680
   Telefax:(213) 689-7904
4
   Attorney for Plaintiff, PETER EUGENE PELAYO, JR.
5

6

7

8         UNITED STATES DISTRICT COURT FOR THE STATE OF CALIFORNIA

9                              CENTRAL DISTRICT

10

11  PETER EUGENE PELAYO, JR.        ) Case No.: CV07-02802 MMM (RZx)
                                    )
12              Petitioner,         ) PLAINTIFF'S MEMORANDUM OF
                                    ) POINTS AND AUTHORITIES IN
13       vs.                        ) OPPOSITION TO DEFENDANTS'
                                    ) MOTION FOR SUMMARY JUDGMENT
14  CITY OF DOWNEY; CITY OF         )
    DOWNEY POLICE DEPARTMENT;       )
15  SGT. IRIZABAL; SGT. ROMERO;     ) DATE:      AUGUST 18, 2008
    OFC. LLAMAS #10494 (AND         ) TIME:      10:00 AM
16  ESTATE OF JOSE LLAMAS); OFC.    ) COURTROOM:   780(ROYBAL)
    YEPES #10084; CPT. DRYER; CPT.  )
17  MILLER; CPT. ESTEVES; OFC.      ) PRETRIAL: AUGUST 25, 2008
    LOCKWOOD #11103; OFC.           ) TRIAL:     SEPTEMBER 16, 2008
18  GARCIA #11382; CPL. SHOCKEY     )
    #16567; OFC. ROSARIO #10085;    )
19  OFC. RODRIGUEZ #11244; LOS      )
    ANGELES COUNTY; LOS             )
20  ANGELES COUNTY SHERIFF'S        )
    DEPARTMENT; DEPUTY              )
21  RUNYAN; DEPUTY BURKE            )
    #253668; DEPUTY EMERY #K95;     )
22  DEPUTY REYNAGA #443556;         )
    DEPUTY CASTELLANOS #455190;     )
23  SGT. CORINA #213435; DEPUTY     )
    DITSCH #235065; DEPUTY          )
24  COCHRAN #209388; DEPUTY         )
    REYNOLDS; DEPUTY BRANDELL;      )
25  and DOES 1 through 50, Inclusive,)
                                    )
26              Respondents.        )
                                    )
27  _____)

28

1

## TABLE OF CONTENTS

2  I.    INTRODUCTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

3  II.   FACTUAL BACKGROUND  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

4        A.   Procedural History  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

5        B.   The Shooting by Officer Llamas  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

6        C.   Pelayo's Criminal Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

7  III.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

8        A.   Standard on Summary Judgment  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

9        B.   Plaintiff Properly Named and Served the Appropriate
10            Entity as Defendant under the Probate Code  . . . . . . . . . . . . . . . . . . . . 5

11       C.   Plaintiff's 1983 Claims Are Not Barred by *Heck*  . . . . . . . . . . . . . . . . . 9

12       D.   Additionally, the Determination as to the Reasonableness of Force Used Is a
13            Question of Fact for the Jury.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

14       E.   Defendant Llamas Is Not Entitled to Qualified Immunity  . . . . . . . . . . . 15

15            1.   *Mr. Pelayo Has Established That There Was a*
                 *Violation of His Fourth Amendment Rights*  . . . . . . . . . . . . . . . . . 15

16            2.   *Mr. Pelayo's Fourth Amendment Rights Were Clearly*
17               *Established at the Time of the Shooting Such That*
                 *A Reasonable Officer Would Understand That*
18               *His Conduct Violates Clearly Established Law*  . . . . . . . . . . . . . . 16

19            3.   *Defendant Llamas' Actions Were Unreasonable*  . . . . . . . . . . . . . 17

20       F.   Mr. Pelayo Can Establish Liability Within the Meaning of *Monell*  . . . . . 19

21 IV.   CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

22

23

24

25

26

27

28

1

## **TABLE OF AUTHORITIES**

2

3

**CASES:**

*Arizona v. California* (2000) 530 US 392, 410, 120 S.Ct. 2304, 2316–2317 . . . . . . . . .  6

*Adickes v. S.H. Kress & Co.* (1970) 398 U.S. 144   . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Anderson v. Liberty Lobby, Inc.,* (1986) 106 S.Ct. 2505   . . . . . . . . . . . . . . . . . . . . . .  5

*Carroll v. Acme–Cleveland Corp.* (7th Cir. 1992) 955 F2d 1107, 1115 . . . . . . . . . . . .  6

*Celotex Corp. v. Catrett,* (1986) 106 S.Ct. 2548   . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

*Cunningham v. Gates,* (9th Circ. 2003) 312 F.3d 1148   . . . . . . . . . . . . . . . . . . . . . . . .  9

*Dial 800 v. Fesbinder* (2004) 118 Cal.App.4th 32   . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

*Drummond v. City of Anaheim* (9th Cir. 2003) 343 F.3d 1052   . . . . . . . . . . . . . . . . 16

*Escobedo v. Estate of Snider* (1997) 14 Cal.4th 1214   . . . . . . . . . . . . . . . . . . . . . . . .  6

*Estate of Bright v. Western Air Lines* (1951) 104 Cal.App.2d 827   . . . . . . . . . . . . . .  6

*Federal Election Comm'n v. National Rifle Ass'n of America*
       (DC Cir. 2001) 254 F3d 173, 189 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

*Fireman's Fund Ins. Co. v. Sparks Construction, Inc.* (2004) 114 Cal.App.4th 1135 . .  8

*Ford v. Ramirez-Palmer* (9th Cir. 2002) 301 F.3d 1043   . . . . . . . . . . . . . . . . . . . . . 15

*Heck v. Humphrey,* (1994) 512 U.S. 477   . . . . . . . . . . . . . . . . . . . . . . . .  9, 10, 11, 13

*Ingraham v. United States* (5th Cir. 1987) 808 F2d 1075, 1079 . . . . . . . . . . . . . . . . .  6

*In re Adbox, Inc.* (9th Cir. 2007) 488 F3d 836, 841–842   . . . . . . . . . . . . . . . . . . . . . .  6

*Liston v. County of Riverside* (9th Cir. 1997) 120 F.3d 965   . . . . . . . . . . . . . . . . . . . 14

*Malley v. Briggs* (1986) 475 U.S. 335   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Martinez v. City of Albuquerque* (10th Cir. 1999) 184 F.3d 1123, 1127   . . . . . . . . . . 12

*Matsushita Electric Industries Co. v. Zenith Radio Corp.,* (1986) 106 S.Ct. 1348   . . . .  5

*Monell v. Department of Social Service of New York City* (1978) 436 U.S. 658   .  19, 20

*Nelson v. Jashurek* (3d Cir. 1997) 109 F.3d 142   . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Newell v. Sauser,* (9th Cir. 1996) 79 F.3d 115   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Oviatt by and through Waugh v. Pearce* (9th Cir. 1992) 954 F.2d 1470   . . . . . . . . . . . 19

*Robinson v. Doe,* (7th Cir. 2001) 272 F.3d 921   . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

 *Saks v. Franklin Covey Co.* (2nd Cir. 2003) 316 F3d 337, 350 . . . . . . . . . . . . . . . . . . 6

*Sanford v. Motts,* (9th Circ. 2001) 258 F.3d 1117   . . . . . . . . . . . . . . . . . . . . 12, 13, 14

*Santos v. Gates,* (9th Cir. 20002) 287 F.3d 846   . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Smith v. City of Hemet* (9th Cir. 2005) 394 F.3d 689   . . . . . . . . . . . 10, 11, 12, 13, 14, 15

*Tanner v. Best* (1940) 40 Cal.App.2d 442   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

*Wells v. Bonner* (5th Cir. 1995) 45 F.3d 90   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Willingham v. Loughnan* (11th Cir. 2001) 261 F.3d 1178   . . . . . . . . . . . . . . . . . . . . . 12

*Woodfield v. Bowman* (5th Cir. 1999) 193 F3d 354, 362 . . . . . . . . . . . . . . . . . . . . . . .  6

iii

1

<u>STATUTES</u>:

2

**Federal**

3

Federal Rules of Civil Procedure, Rule 56(c)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

4

42 U.S.C. § 1983  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2, 11, 18

5

**State**

6

Code Civ. Proc., § 418.10   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

7

Code Civ. Proc., § 410.50   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

8

Penal Code §148(a)(1)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4, 8, 9, 11, 12, 13

Penal Code § 245(d)(1)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

9

Penal Code § 459   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4, 9

10

Penal Code § 484   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

11

Penal Code § 496   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

Penal Code § 666   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4, 9

12

Probate Code § 550   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6, 7, 8

13

Probate Code § 552   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6, 7, 8

14

15

<u>TREATISES</u>:

16

2 Witkin, Cal. Procedure (4th ed. 1996) Jurisdiction, § 184   . . . . . . . . . . . . . . . . . . . .   7

17

2 Witkin, Cal. Procedure (4th ed. 1996) Jurisdiction, § 190   . . . . . . . . . . . . . . . . . . . .   8

3 Witkin, Cal. Procedure (4th ed. 1996) Actions, § 875   . . . . . . . . . . . . . . . . . . . .   7

18

3 Witkin, Cal. Procedure (4th ed. 1996) Actions, § 883   . . . . . . . . . . . . . . . . . . . . . . .   7

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS & AUTHORITIES

## I.    INTRODUCTION

Defendants, City of Downey, Jose Llamas and estate of Jose Llamas have moved for summary judgment and/or adjudication against Plaintiff Peter Pelayo pursuant to the Federal Rules of Civil Procedure, Rule 56(c).

## II.    FACTUAL BACKGROUND

On April 29, 2006, at approximately 4:30 a.m., Plaintiff was driving his girlfriend's car alone in Downey and entered a parking structure without the headlights on and the door partially open. Defendant SHOCKEY observed this from his stationary, marked patrol car and suspected that Plaintiff was entering the parking structure without his headlights on and with his door open so that Plaintiff could dispose of evidence of a crime.

Mr. Pelayo did not pull over and stop because he was scared about an outstanding warrant for a suspended license and 2 outstanding tickets. He has been employed since his release from jail. He works at Aviation Repair Solutions in Long Beach as an inspector, where he currently earns $17.25 per hour. He is currently on medication, Lithium 900 mg and Seroquel 100 mg. He is a part time student at Cerritos College, majoring in mechanical engineering. He is 24 years old and lives on his own.

Officer SHOCKEY then stopped Plaintiff for entering a parking structure without his headlights on in violation of Section 24250 of the California Vehicle Code. Plaintiff stopped the car, exited the car, locked it, then relocked it and began to run away from SHOCKEY. SHOCKEY began to pursue Plaintiff. Plaintiff ran into a nearby church, First Baptist Church and hid. SHOCKEY called dispatch to set up a containment around the church. Officers IRIZABAL, ROMERO, RODRIGUEZ, LLAMAS, YEPES, RUNYAN, LOCKWOOD, and GARCIA responded and set up a containment around the church. Defendants YEPES, IRIZABAL, ROMERO, RODRIGUEZ, and LLAMAS entered the church and began searching for Plaintiff and found him in one of the classrooms. Defendant LLAMAS fired 10 shots at Plaintiff, hitting him in his right rear hamstring and left thumb. Defendant LLAMAS later claimed to have seen Plaintiff raise a gray, metallic object in Defendant

1

LLAMAS'S direction. Defendant Llamas later stated that plaintiff raised his right arm and aimed the metallic object which he was positive was a 45 caliber gun, even going so far as to describe the manufacturer in a statement provided by defendant as an exhibit in their motion, and attached as Exhibit 9 to this opposition.

Plaintiff continued to flee from the officers down a staircase, out of the church into the church's courtyard, and back into the church's gymnasium, leaving a trail of his blood from his gunshot wounds. Once inside the gymnasium, Plaintiff saw a raised stage area with a set of stairs leading up to the stage. A false floor was constructed on the stage floor. The false floor pulled out over an empty space in which Plaintiff hid, pulling the floor shut after he was inside.

Deputies of LOS ANGELES COUNTY SHERIFF'S DEPARTMENT arrived with K-9 dogs. The DEPUTIES and POLICE conducted a joint search of the gymnasium and stage and eventually found Plaintiff hiding under the false floor. The DEPUTIES restrained Plaintiff, and moved Plaintiff from the hiding place after pulling apart the false floor. They then picked Plaintiff off the ground and sat him up several feet from the hiding place. They then intentionally allowed the K-9 dog "Randy" to bite Plaintiff after he no longer posed a threat and they could see his hands. Plaintiff was then taken into custody. He gave a full and honest statement to the investigating officers, also an exhibit to Defendants motion.

Plaintiff was taken to St. Francis Medical Center, administered emergency medical treatment for his gunshot wounds and dog bites, then booked at the Los Angeles County Jail. At no time during the above-described events was Plaintiff in  possession of a firearm. However, Defendant LLAMAS'S report indicates that Plaintiff did have a firearm of unknown caliber. No such evidence has ever been found. Llamas made a false statement, fired at plaintiff who did not pose deadly force and filed a false report. He was not interviewed until April 30, 2006, 3 days later.

A.    **Procedural History**

Plaintiff Pelayo  filed a civil complaint on or about April 27, 2007, alleging that his constitutional rights were violated and seeking recovery under 42 U.S.C. section 1983. On

May 23, 2008 a Stipulation and Order was made to dismiss the defendants other than City of Downey, José Llamas and estate of Jose Llamas.

**B.   The Shooting by Officer Llamas**

In a supplemental report prepared by Officer Rodriguez, dated 5/1/06 (part of Exhibit 5) he said that while searching the courtyard area, Officer Llamas told him that plaintiff Pelayo had raised his arm and was holding a gray metallic object pointing the object in his direction. He also indicated he heard three to four gunshots and seconds later heard four to five gunshots. Officer Yepes in his supplemental report (part of Exhibit 5) also said the exact same thing that Officer Llamas said, "Let me see your hands," seconds later four to five gunshots, seconds later three to four gunshots. He also said that Llamas said that Pelayo raised a gray metallic object in his direction. These reports were provided in defendants' initial disclosures.

The Defendants' Statement of Uncontroverted Facts contains 76 facts which in Defendants' view purportedly comprise all that is necessary to establish summary judgment. The facts in this case that are omitted from Defendants' statement are the critical facts which form the basis for the Plaintiff's claims against Llamas and the City of Downey. These facts are that Officer Llamas told investigators that he was sure Plaintiff had a gun, that the gun appeared to be 45-caliber semiautomatic weapon and that the Plaintiff aimed the gun in his direction on two separate occasions and that he shot Plaintiff based on these observations. Further, that even though a comprehensive search of the church compound was made, no 45-caliber handgun was ever found (See, Exhibit 5; Exhibit 13; Exhibit 16). The fact that Plaintiff did not have a gun when he was captured, the fact that no 45-caliber was ever found, together with the fact that Officer Llamas is the only individual who has alleged to have seen the 45-caliber handgun all point to the fact that there are factual disputes as to whether (1) Officer Llamas was mistaken or even lied about what he saw, (2) the presence of a gun, (3) Pelayos' aiming the gun at him, and (4) whether the use of force was justified. Defendant Llamas, in Plaintiff's view, did lie because Plaintiff never had a 45-caliber gun, and Plaintiff has never been convicted of any weapons violations. Defendant Llamas fired the gun without

3

1  any basis or reasonable belief that he was in fear of deadly force. There is also a factual

2  discrepancy between how many rounds were fired. Officer Shockley and Officer Romero

3  both said six shots, but the evidence supports a finding of ten shots.(Exhibits 10, 14, 15).

4  In Defendant City of Downey's response to Plaintiff's Request for Admissions the

5  City neither admitted nor denied that they have no evidence that Plaintiff ever possessed a

6  gun on April 26, 2006. They contend they lack sufficient information to know whether

7  plaintiff was ever in possession of a gun on April 26, 2006. In Request for Admission No.

8  2 they admitted Jose Llamas was the only Downey employee who had seen Plaintiff holding

9  a gun. In Request for Admission No. 3 Officer Llamas told Officer Romero that on the date

10  of the incident he was positive that Plaintiff had a gun. He also told Romero, which was

11  admitted in Request for Admission No. 4, that Pelayo pointed a gun at him.

12  In Request for Admission No. 11, Jose Llamas told investigators that he believed he

13  put over the radio that Plaintiff had a gun in his hand, In Request for Admission No. 12, the

14  City admitted that no peace officer other than Jose Llamas fired his weapon at Plaintiff on

15  April 26, 2006. In Request for Admission No. 13, Officer Llamas told investigators that

16  Plaintiff raised his arm on one occasion and started to raise his arm on another occasion and

17  that he thought he was a "goner" and had to shoot Plaintiff. The Response to Request for

18  Admissions are attached collectively as [Exhibit 12].

19  The Los Angeles County District Attorneys letter to Chief Roy Campos (Exhibit 15)

20  where the use of deadly force was found to be within department policy, on page 3 of 5 of

21  the report it states that investigators collected ten 9-millimeter cartridges from the shooting

22  scene.

23  What this case boils down to is whether Officer Llamas fired ten shots at Plaintiff

24  when Plaintiff did not have a gun and whether a jury could find such actions violated

25  Plaintiff's Fourth Amendment rights. Most of the facts that are contained in Defendants'

26  Separate Statement are merely there for the purpose of shedding a bad light on Plaintiff and

27  have nothing to do with the core issues of the case.

28  C.    Pelayo's Criminal Case

4

As a result of this incident, Pelayo was charged with violating Penal Code §§ 459, 484, 496, 148 (a)(1). He pleaded guilty to violating Penal Code §666, petty theft with a prior; §459, commercial burglary of the Krikorian Theatre(where Mr. Pelayo was previously employed)and §148(a)(1), resisting the arrest of Shockey and Llamas after a negotiated disposition was agreed to between his defense counsel and the District Attorney's office.

## III.    ARGUMENT

### A.    Summary Judgment Standard

Summary judgment, as well as summary adjudication of distinct causes of action or issues, is appropriate where there exists no genuine issue of material fact. In such an instance, the moving party is entitled to judgment as a matter of law. Fed. Rules Civ. Proc., Rule 56(c); 28 U.S.C.

On a motion for summary judgment, a moving party bears the initial responsibility of identifying those portions of the signed "pleadings, depositions, answers to interrogatories and admissions on file, which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, (1986) 106 S.Ct. 2548, 2553.

When the non-moving party meets its initial responsibility, the burden shifts to the opposing party to establish there exists a genuine issue as to any material fact. *Matsushita Electric Industries Co. v. Zenith Radio Corp.*, (1986) 106 S.Ct. 1348, 1356. The opposing party must demonstrate that the fact in contention is material, i.e., that the fact must affect the outcome of the action. *Anderson v. Liberty Lobby, Inc.*, (1986) 106 S.Ct. 2505, 2510. Furthermore, the opposing party may not rely on its pleadings, but must tender specific facts in the form of affidavits or other admissible evidence. Fed. Rules Civ. Proc., Rule 56(e); 28 U.S.C.; *Matsushita, supra*, 106 S.Ct. at 1356. Defendant's memorandum of points and authorities focuses almost exclusively on the pre-shooting behavior of plaintiff. That behavior is really immaterial to the core contentions in plaintiff's complaint. Plaintiff's driving without his headlights on, his failure to stop his vehicle when Officer Shockey tried to effect a traffic stop, his running into the First Baptist Church and hiding, these are the

1   actions which comprise the bulk of defendants supporting facts.

2   **B.    Plaintiff Properly Named and Served the Appropriate Entity as**

3   **Defendant under the Probate Code**

4   This argument is a recent development in the case. With no affirmative defense pled

5   the issue of the Probate Code suddenly becomes the defendants raison d'etre . The first

6   inkling that the defendants were raising this issue was through correspondence on May 27,

7   2008, when counsel for defendants, Scott Caron wrote a letter to plaintiffs counsel requesting

8   a copy of the creditor claim for the estate of Officer Llamas pursuant to Probate Code Section

9   9351, attached as [Exhibit 7]. On June 2, 2008, Scott Caron sent another letter [Exhibit 8],

10   retreating from his earlier position and now stating that since no probate was administered

11   plaintiff designated the wrong entity by naming the Estate of José Llamas. Now, three

12   months before trial, defendants make an argument that the estate of Officer Llamas and

13   Officer Llamas should not be part of this case because of a defect that they knew about but

14   failed to give notice of before. Llamas did not plead an affirmative defense in his answer that

15   raised this issue before.

16   The answer must provide "fair notice" of any such defense to enable plaintiff to

17   conduct discovery and develop any responses to the defense. [Woodfield v. Bowman (5th

18   Cir. 1999) 193 F3d 354, 362; Federal Election Comm'n v. National Rifle Ass'n of America

19   (DC Cir. 2001) 254 F3d 173, 189; Saks v. Franklin Covey Co. (2nd Cir. 2003) 316 F3d 337,

20   350](3) [8:229] Waiver by failure to plead affirmative defense: Generally, if not asserted in

21   a responsive pleading, the affirmative defense is waived, and evidence of such defense is

22   inadmissible at trial. [Arizona v. California (2000) 530 US 392, 410, 120 S.Ct. 2304,

23   2316–2317; Carroll v. Acme–Cleveland Corp. (7th Cir. 1992) 955 F2d 1107, 1115; Ingraham

24   v. United States (5th Cir. 1987) 808 F2d 1075, 1079; see also ¶ 9:26 ff. (defenses waived if

25   not raised in preanswer motion or answer) & ¶ 9:43 ff. (nonwaivable defenses); In re Adbox,

26   Inc. (9th Cir. 2007) 488 F3d 836, 841–842].

27   Probate Code Sections 550 and 552 provide:

28   **§ 550. Commencement or continuation of action against estate;**

6

cumulative remedy

(a) Subject to the provisions of this chapter, an action to establish the decedent's liability for which the decedent was protected by insurance may be commenced or continued against the decedent's estate **without the need to join as a party the decedent's personal representative or successor in interest.**

**§ 552. Parties; substitution; consolidation**

(a) An action under this chapter shall name as the defendant, "Estate of (name of decedent), Deceased." **Summons shall be served on a person designated in writing by the insurer or, if none, on the insurer.** Further proceedings shall be in the name of the estate, but otherwise shall be conducted in the same manner as if the action were against the personal representative.

Plaintiff's complaint named as a defendant: "Officer Llamas #10494 and Estate of Jose Llamas." Defendants are correct as to the nature of an estate, for "An 'estate' can neither sue nor be sued." *Estate of Bright v. Western Air Lines* (1951) 104 Cal.App.2d 827, 829. "The 'estate' of a decedent is not an entity known to the law. It is neither a natural nor an artificial person. It is merely a name to indicate the sum total of the assets and liabilities of a decedent, or of an incompetent, or of a bankrupt." *Tanner v. Best* (1940) 40 Cal.App.2d 442, 445. "

There is, however, an exception to this rule, as set forth above under Probate Code §§ 550 and 552, which exception applies in this case. Thus, where a decedent was insured at the time of incident complained of, and the complainant wishes to make a claim against the decedent's insurance, only the estate need be named.

Here, Jose Llamas, as a Police Officer with the City of Downey acting in his role as Police Officer, was protected by insurance. The purpose of Plaintiff's action is to claim under the decedent's insurance with the City of Downey for the damages incurred. Plaintiff had no intention of pursuing any claim against the decedent's estate personally.

7

1   As Plaintiff is not seeking to sue the Estate, but rather to recover under insurance,

2   naming of the Estate alone was proper. In such circumstances, it was not necessary to name

3   an executor or personal representative. See, e.g., *Escobedo v. Estate of Snider* (1997) 14

4   Cal.4th 1214 (Escobedo's mother, Mary Ruth Escobedo, brought an action for wrongful death

5   against Snider's estate, but, pursuant to Probate Code § 552, served the complaint on Snider's

6   former insurer, National Aviation Underwriters, Inc. (National), rather than on his personal

7   representative.  Approving the service, the court noted that under Probate Code § 554,

8   plaintiff's recovery was thus limited to the amount of the insurance coverage.)  Here, since

9   the estate was named as a defendant, this action is an action permitted under Probate Code

10  §§ 550 and 552.

11  The City of Downey is self-insured.  Plaintiff served the complaint on the City, as

12  insurer.

13  Probate Code § 552, subdivision (a) requires summons be served on the insurer or its

14  designee. A summons "is the usual means by which the court gives jurisdictional notice to

15  the defendant, directs his appearance, and thus acquires jurisdiction of his person." 3 Witkin,

16  Cal. Procedure (4th ed. 1996) Actions, § 875, p. 1063. Defective service may be challenged

17  by a special appearance and motion to quash.  *Id.*, § 883, p. 1069; see Code Civ. Proc., §

18  418.10.

19  The Estate of Llamas did not challenge the lack of service by these methods.

20  Instead, Estate of Llamas made a general appearance in the action by, among other things,

21  answering the complaint, and moving for summary judgment on the merits. *Dial 800 v.*

22  *Fesbinder* (2004) 118 Cal.App.4th 32, 53 [If defendant seeks affirmative relief on the merits,

23  application may be deemed a general appearance.]. Generally, a defendant makes a general

24  appearance when he takes part in the action. 2 Witkin, Cal. Procedure (4th ed. 1996)

25  Jurisdiction, § 184, p. 747.

26  "A general appearance by a party is equivalent to personal service of summons on

27  such party." Code Civ. Proc., § 410.50, subd. (a). "A general appearance operates as a

28  consent to jurisdiction of the person, dispensing with the requirement of service of process,

1    and curing defects in service." 2 Witkin, Cal. Procedure, *supra,* Jurisdiction, § 190, p. 756.

2    In *Fireman's Fund Ins. Co. v. Sparks Construction, Inc.* (2004) 114 Cal.App.4th 1135, 1147,

3    the court held the long-standing rule that a general appearance "waives" objections to service

4    is actually a matter of forfeiture, not waiver. "Service of summons is required in order to give

5    the defendant notice of the action, as due process demands. [Citation.] But once the

6    defendant appears in the action, this purpose has been served. 'A defendant has a right to

7    demand that process be issued against him in the manner provided by law, but if process is

8    not so issued and he appears generally without making objection, such appearance, being the

9    purpose of the process, confers jurisdiction of the person and the court is empowered to act

10   in the premises.' [Citation.]" (*Ibid.*)

11          The Estate of Jose Llamas filed an answer to the complaint more than one year ago,

12   filed a Joint Rule 26 report, oppositions to petition to file a late claim in state court,

13   objections to evidence submitted, propounded written discovery, designated a medical expert

14   witness, and now files a motion for summary judgment.  By making general appearances

15   since the commencement of this action, the Estate of Llamas forfeited any claim as to defects

16   in service as a matter of law.

17          Plaintiff is making a claim under the insurance for deceased Office Llamas. He

18   properly named the Estate and served the City as self-insurer of its police officers on duty.

19   There is therefore no merit to Defendants' argument that Plaintiff failed to name the correct

20   entity.

21   **C.      Plaintiff's 1983 Claims Are Not Barred by *Heck.***

22          In *Heck v. Humphrey,* (1994) 512 U.S. 477, the United States Supreme Court decided

23   whether a person convicted of a criminal act can maintain a Section 1983 action which

24   challenges the constitutionality of the criminal conviction. The court in *Heck* held:

25              "[W]hen a state prisoner seeks damages in a section 1983 suit, the
              district court must consider whether a judgment in favor of the plaintiff would
26            necessarily imply the invalidity of his conviction or sentence; if it would, the
              complaint must be dismissed unless the plaintiff can demonstrate that the
27            conviction or sentence has already been invalidated." ( Id. at 486-87.)

28

1    Thus, according to the *Heck* Court, the relevant question is whether success in a
2    subsequent section 1983 suit would necessarily imply or demonstrate the invalidity of the
3    earlier conviction or sentence. *Id.* at 487; *Smith v. City of Hemet* (9th Cir. 2005) 394 F.3d
4    689, 695; see also *Cunningham v. Gates,* (9th Circ. 2003) 312 F.3d 1148, 1153-54. Heck
5    bars suits based on theories that necessarily imply the invalidity of the plaintiff's convictions
6    or sentences unless the underlying conviction has been "reversed on direct appeal, expunged
7    by executive order, declared invalid by a state tribunal..., or called into question by a federal
8    court's issuance of a writ of habeas corpus. *Id.* at 487; *Cunningham, supra,* 312 F.3d at
9    1153-54. But, if the plaintiff's action, even if successful, will not demonstrate the invalidity
10   of any outstanding criminal judgment against the plaintiff, the action should be allowed to
11   proceed. *Heck, supra,* 512 U.S. at 487.

12   Plaintiff Pelayo's complaint is not barred by *Heck* because success in his section 1983
13   action does not necessarily imply the invalidity of his criminal convictions.

14   Plaintiff's complaint alleging excessive force and deliberate indifference respectively
15   under section 1983, are unrelated to the conduct for which he was convicted and,
16   consequently, not barred by *Heck.* A verdict in Plaintiff's favor does not necessarily
17   invalidate his conviction under Penal Code sections 148(a), 459, and 666.

18   Moreover, an allegation of excessive force is not barred by *Heck* if the excessive force
19   alleged was employed subsequent to the time that the defendant engaged in the conduct that
20   constituted the basis for his conviction. See, *Smith, supra,* 394 F.3d at 693 (emphasis in
21   original). As the *Smith* court stated, a conviction based on conduct that occurred before the
22   officer commences the process of arrest is not necessarily rendered invalid by the officer's
23   subsequent use of excessive force in making the arrest. *Id.* at 696.

24   In the present case, the record contains evidence that Plaintiff's conviction was based
25   on conduct that occurred before Defendant Llamas shot Plaintiff and subsequent to that
26   action when he was hiding under the false stage for eight hours.    Thus, because there is
27   evidence that plaintiff's convictions were not based solely on conduct occurring prior to the
28   shooting or after the shooting, plaintiff's excessive force claim is not inconsistent with his

1   convictions under Penal Code §148(a)(1). In fact, the transcript of the plea agreement is
2   attached as [Exhibit 3] to this opposition and Count 5, a single count, a violation of Penal
3   Code § 148 that on April 29, 2006 that he did delay and obstruct Officers Shockey and
4   Llamas. Indeed, the two counts are combined into one which tells us that the resistance
5   occurred from the moment Pelayo ran from Shockey and was a continuing resistance up until
6   the time he was found ten hours later.

7        Defendants contend that Plaintiff's claims under Heck because the allegation of
8   excessive force necessarily implies the invalidity of Plaintiff's convictions. In making that
9   assertion, Defendants rely in particular on the argument that *Smith* does not apply to this case
10  because the violation did not occur in phases as it did in *Smith*. Defendants argue at the
11  violation arose from the conduct at the time of the shooting and incorrectly argue that the
12  conduct Plaintiff was specifically charged with and subsequently pleaded guilty to was
13  resisting officer Llamas - - this falsity is a cornerstone of their argument. The fact is, this
14  resistance did occur in phases and the Defendants omits that Shockey was also an officer in
15  the plea agreement specifically named.  According to the Downey Police Department crime
16  report for case No. 0624665, Plaintiff Peter Pelayo committed the crime of aggravated
17  assault, Penal Code § 245(d)(1) on Officer Jose Llamas, a police officer inside a church.
18  According to the report:

19      The suspect head on foot after a traffic stop.  The Suspect runs into a church
        and assaults a police officer with a firearm. On 4/29/06 at 0431 hours Officer
20      Shockey observed the plaintiff driving with its headlights off.  He initiated a
        traffic stop by activating his overhead red and blue lights.  He then activated
21      the rotating overhead red and blue light and "takedown" light just east as it
22      reached the mid block between Civic Center Drive and Downey Avenue.  He
        advised dispatch that plaintiff ran inside of the church and requested to set up
23      a containment. He heard approximately six to seven shots fired approximately
        five minutes after Sergeant Irizabal, Officer Rodriguez and Officer Llamas
24      began walking toward the courtyard in the center of the church.  During that
25      time he maintained his position at the southeast corner of the church until
        Sergeant Romero relieved him.

26

27      Defendants state that  any claim that Officer Shockey  used excessive force would
28  imply the invalidity of Pelayo's  conviction and, thereby, Defendants seem to suggest that

*Heck* imposes a bright-line rule to the effect that a section 1983 suit alleging excessive force will never lie when a Plaintiff has been convicted of resisting arrest. However, Defendants' position is directly contradicted by the fact the Ninth Circuit has explicitly held that *Heck* does not necessarily bar section 1983 actions alleging excessive force despite the plaintiff's conviction for resisting arrest. *Smith, supra,* 394 F.3d at 696; *Sanford v. Motts,* (9th Circ. 2001) 258 F.3d 1117, 1119-20. Other circuits have held that *Heck* does not bar section 1983 actions alleging excessive force despite the plaintiff's conviction for resisting arrest. [See e.g. *Robinson v. Doe,* (7th Cir. 2001) 272 F.3d 921, 923 (holding that a finding of excessive force in a section 1983 action would not necessarily imply the invalidity of plaintiff's conviction for resisting arrest); *Willingham v. Loughnan,* 261 F.3d 1178, 1183 (11th Cir. 2001) cert. granted and judgment vacated on other grounds, (2002) 537 U.S. 801 (same); *Martinez v. City of Albuquerque,* 184 F.3d 1123, 1127 (10th Cir. 1999) (same); *Nelson v. Jashurek,* 109 F.3d 142 (3d Cir. 1997) (same); *Wells v. Bonner* 45 F.3d 90, 95 (5th Cir. 1995) (same).]

Since *Heck* does not necessarily bar a section 1983 plaintiff alleging excessive force from his day in court simply because of a resisting arrest conviction, the inquiry then turns on whether there is a clear showing on the record that Plaintiff's action will impugn the underlying conviction. *Smith, supra,* 394 F.3d at 699. There is no clear showing on the record that Plaintiff Pelayo's action will impugn his underlying convictions. To the contrary, as previously discussed, the record indicates that this action will not render his convictions invalid since Plaintiff pleaded guilty to one count of resisting arrest and his resistance was done in stages that occurred over a 15 to 20 minute interval as the shooting did not occur in seconds, as the Defendants argue.

As already discussed, the record in the instant matter does indicate that the acts supporting Plaintiff's conviction occurred at the exact moment of the shooting, and even if such an inference could be made, there were numerous intervals of time in which the resistance could be separated from the shooting.

*Smith* holds that "the time of the arrest" does not include previous stages of law enforcement activities that might or might not lead to an arrest, such as conducting an

investigation; it includes only the time during which the arrest is being effected. A conviction for resisting arrest under § 148(a)(1) may be lawfully obtained only if the officers do not use excessive force in the course of making that arrest. A conviction based on conduct that occurred before the officers commence the process of arresting the defendant is not "necessarily" rendered invalid by the officers' subsequent use of excessive force in making the arrest. For example, the officers do not act unlawfully when they perform investigative duties a defendant seeks to obstruct, but only afterwards when they employ excessive force in making the arrest. Similarly, excessive force used after a defendant has been arrested may properly be the subject of a § 1983 action notwithstanding the defendant's conviction on a charge of resisting an arrest that was itself lawfully conducted. See, e.g., *Sanford v. Motts, supra*, at 1119-20 (explaining that a successful § 1983 suit based on excessive force would not necessarily imply the invalidity of Sanford's conviction under § 148(a)(1) because the officer's use of excessive force occurred subsequent to the conduct for which Sanford was convicted under § 148(a)(1)).

Moreover, since Plaintiff pleaded guilty to resisting arrest, the arrest must have been lawful. The acts when Llamas shot him were unlawful because Llamas used excessive force; therefore, logically, the moment when Plaintiff was shot could not be the moment that Plaintiff resisted a lawful arrest.

As *Smith* notes:

> "The defendants' argument wrongly focuses on Smith's conduct rather than the officers'. There were two different phases of the officers' conduct here – first, the investigative phase; then, when Smith repeatedly refused to cooperate, the arrest for violating § 148(a)(1) and for the underlying offense that otherwise might or might not have led to an arrest. The officers' allegedly unlawful conduct which transpired after they decided to use physical force to subdue Smith occurred during the second phase of their law enforcement activities, during the course of their effort to take Smith into custody. Prior to that time, during the investigative phase, they had issued only verbal commands, all of which were concededly well within the bounds of their general police powers. Smith's obstruction of that investigation came to an end when the officers decided to arrest him. Thereafter, in the course of the arrest, they allegedly engaged in the use of excessive force that rendered the arrest unlawful. It did not, however, render their preceding

13

investigation unlawful, nor would it for Heck purposes invalidate a conviction for obstructing that investigation. California law immunizes Smith from prosecution for any conduct that occurred at the time of, or during the course of his unlawful arrest, but it does not immunize him from prosecution for unlawful conduct that occurred prior or subsequent to that time."

"There is one remaining complication. As in *Sanford v. Motts,* "nothing in the record informs us what the factual basis for [Smith's] plea" was. [Citation]. There is no indication as to whether Smith's plea was based on his conduct that impeded the officers' investigation before they came onto the porch, or his subsequent resistance to their physical attempt to arrest him, or both. The record is clear that Smith pled guilty to one count of violating § 148(a)(1), but there is no information as to which of his actions constituted the basis for his plea. The charging complaint simply states that Smith violated § 148(a)(1) when he wilfully and unlawfully resisted, delayed, and obstructed the defendant officers in the discharge of, and attempt to discharge, their duty. Neither party in its briefs or at oral argument was able to identify the facts underlying the plea or to advise us regarding what transpired at the time Smith entered his plea. It is therefore entirely possible that, as Smith asserts, he pled guilty to a violation of § 148(a)(1) on the basis of his actions during the time the officers were conducting their lawful investigation. As the officers acted lawfully in issuing orders to Smith while they were on the ground below where he was standing on his porch, his disobedience of those orders, as we have explained, would not be immunized from prosecution by the officers' subsequent unlawful acts after they decided to arrest him. Because we are unable to determine "the factual basis for [Smith's] plea," *id.,* his lawsuit does not necessarily imply the invalidity of his conviction and is therefore not barred by *Heck.* (citing to *Heck,* 512 U.S. at 487, 114 S.Ct. 2364.)" *Smith, supra,* 394 F.3d 689.

Similarly, there is nothing in the plea transcript that spells out the factual basis of the plea.

**D.      Additionally, the Determination as to the Reasonableness of Force Used Is a Question of Fact for the Jury.**

In *Smith,* the court stated: "Because the excessive force inquiry nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, the courts have held on many occasions that summary judgment... in excessive force cases should be granted sparingly." 394 F.3d at 700; *Santos v. Gates,* (9th Cir. 20002) 287 F.3d 846, 853;

14

see also *Liston v. County of Riverside*, (9th Cir. 1997) 120 F.3d 965, 976 (as amended) (stating "we have held repeatedly that the reasonableness of force used is ordinarily a question of fact for the jury.) The court in *Smith* goes on to explain that reasonableness is best determined by the jury since such cases almost always turn on a jury's credibility determinations. *Smith,* 394 F.3d at 700.

The determination as to whether Defendant Llamas used excessive force when he decided to shoot Plaintiff involves precisely the sensitive situation of sifting and inferring to which these courts alluded in their opinions. This case necessarily requires that the fact finder sift through disputed facts and draw inferences therefrom, such that a determination can be reached as to whether Defendant Llamas' decision to shoot Plaintiff was reasonable. Thus, the determination as to the reasonableness of forced used by Defendant Llamas is a question of fact for the jury to decide and should not be disposed of via summary judgment.

## E.     Defendant Llamas Is Not Entitled to Qualified Immunity.

In determining whether an official is entitled to qualified immunity, a district court must consider: (1) whether the plaintiff has identified a specific federal statutory or constitutional right that has been allegedly violated; (2) whether that right was so clearly established as to alert a reasonable official to its parameters; and (3) whether a reasonable officer could have believed his or her conduct was lawful. *Ford v. Ramirez-Palmer* (9th Cir. 2002) 301 F.3d 1043; *Newell v. Sauser*, (9th Cir. 1996) 79 F.3d 115, 117. Unarmed suspects, even if running from the police have a clearly established right not to shoot.

> *1.     Mr. Pelayo Has Established That There Was a Violation of His Fourth Amendment Rights.*

As already discussed, Plaintiff can establish that there was a violation of his Fourth Amendment right to be free from an unreasonable seizure because the force used by Defendant Llamas was unreasonable. Further, Mr. Pelayo was running as though he was not trying to hold onto a gun or had a gun with him. [Exhibit 10]. Officer Shockey said he heard six or seven shots, four in succession and then two more. He could hear some yelling. Sergeant Ralph Romero said that Officer Llamas told him that Pelayo pointed a gun at him

that that Officer Llamas was positive it was a gun.    Page 5 of the report No. 406-000563199-055.[See deposition of Shockey, attached as Exhibit 10].

>    2.    *Mr. Pelayo's Fourth Amendment Rights Were Clearly Established at the Time of the Shooting Such That a Reasonable Officer Would Understand That His Conduct Violates Clearly Established Law.*

In excessive force cases, a district court must consider whether, under the circumstances, a reasonable officer would have had fair notice that the force employed was unlawful, and whether any mistake to the contrary would have been unreasonable. *Drummond v. City of Anaheim* (9th Cir. 2003) 343 F.3d 1052, 1060.

In the instant case, Defendant Llamas had fair notice that the deadly force he employed was unlawful and any mistake to the contrary would have been unreasonable. Defendant Llamas said he saw Plaintiff with a weapon. But as enumerated in this opposition and in plaintiff's separate statement of uncontroverted facts, there was no weapon found, and it is outrageous is for someone to suggest that plaintiff while running, stopped and aimed a set of keys at a police officer with a gun on two separate occasions, and the jury can infer that officer llamas might have a propensity to shoot his weapon by his subsequent suicide action as well. This is clearly a factual question the jury decide.  Moreover, the sheer number of gunshots fired, 10 shots in the dark in an enclosed area, endangering other officers, risk of cross fire and ricocheting bullets are in totality acts of a reckless fool and, if the jury believes Pelayo, a liar. Even officer Romero, who was alongside officer Llamas as they reached over the balcony - - did not shoot, Llamas did, and there was nothing Romero could see as he fired.

Defendant Llamas had knowledge of facts that would alert him that he was violating Plaintiff's constitutional rights. As noted above, a similarly trained and experience officer, faced with the same set of facts and circumstances, would not have behaved in a similar illegal manner. Finally, Defendants  argue that Plaintiff has no competent evidence to establish that Officer Llamas' conduct was unreasonable because he did not designate a liability expert. Neither side designated a liability expert.  This was discussed between

counsel on numerous occasions because this case comes down to one thing: either the jury believes that Officer Llamas lied about Pelayo having a gun or they believe Plaintiff lied and the gun was never found.

> 3.    *Defendant Llamas' Actions Were Unreasonable.*

Sergeant Ralph Romero states that he never saw Plaintiff, that he heard six shots total (Romero Depo, 16:15-17) that he saw Pelayo holding an object that looked like 45-calibre handgun (Romero Depo, 17:14-19) that Llamas turned the corner and the Romero heard shots fired. After those shots, Romero said they had seen Pelayo in the interior of the perimeter, they could see a blood trail going southbound and he decided to pull everyone back and tighten up the perimeter. He also said that he had been able to see clearly without using his flashlight (Romero Depo, 23:4-13), but this was a situation in which an officer would not use a flashlight to avoid exposing himself as a target (Romero Depo, 23:19-24).

Officer Romero reconfirmed that Llamas told him that he thought he was a goner, that no 45 caliber weapon was found and that Officer Llamas told him that he was positive he had seen a gun (Romero Depo, 27:21-28:4).

Romero never heard Llamas say during the incident that Pelayo had a gun even though it part of police training for an officer who sees a suspect with a gun to warn the other officers of a gun.

In fact, he never heard Llamas say any word about somebody being arrest or that Pelayo had a gun (Romero Depo, 38:9-13), just as unreasonable as the Defendant's position is Romero's belief that Pelayo's gun is still at the church unfound.(Romero Depo, 39:23-24).

The officers including Romero later obtained the keys to the facility and searched it, there was no place that they could not go and search ( Romero Depo, 40:2-24). Romero never heard a sound consistent with a 45-caliber gun being thrown (Romero Depo, 41:2-5). Romero also stated that 20 minutes passed from the time heard Shockey put on the radio that he was in pursuit of Pelayo to the time that Romero heard gunshots. That answer was later changed to 10 to 15 minutes (Romero Depo, 45:9-25; 46:1-2; 48:25-49:1). [Romero Deposition, Exhibit 11].

1    There is no evidence that Romero had any recollection whether Llamas' flashlight was
2    on or off (Romero Depo, 56:9-16). In Shockey's deposition he never saw anything being
3    thrown out of Toyota's door, therefore there was no basis to charge Mr. Pelayo with
4    destruction of evidence of a crime. He never called for backup (Shockey Depo, 8:14-16).
5    When the Toyota reached the street its lights were turned on (Shockey Depo, 10:9-11).
6    Shockey never saw anything in Pelayo's hands, such as a gun or any other type of weapon
7    (Shockey Depo, 14:25-15:26). He said that Plaintiff was running full bore, not as if secreting
8    a large weapon. Shockey never told anyone that Pelayo was armed, the only person Shockey
9    is aware of having seen Pelayo with a gun was Llamas and Shockey based these assertions
10   from talking to Llamas (Shockey Depo, 15:7-15). Shockey never saw which entrance Pelayo
11   used to get into the church because he lost visual sight of Pelayo during the chase (Shockey
12   Depo, 17:18-23). Shockey remained outside the church in his car at the direction of Sergent
13   Irizabal (Shockey Depo, 21:14-17). He then heard someone yelling and six to seven shots
14   fired. Five to ten minutes passed between the time the officers saw Pelayo on the second floor
15   and the six to seven were fired (Shockey Depo, 23:16-20). Per Shockey three to five seconds
16   passed between the time he heard the yelling and the shots (Shockey Depo, 27:5-8). Shockey
17   too never heard an officer yell gun (Shockey Depo, 29:23-25). Llamas told Shockey at the
18   station after the incident that Llamas had seen Pelayo holding a gun (Shockey Depo, 41:4-6).
19   [Shockey Deposition, Exhibit 10]

20       As already argued, Defendant Llamas' actions were unreasonable given the facts and
21   circumstances he was presented with - - he was not responding to an imminent threat of death
22   or serious bodily injury.

23       Qualified immunity "provides ample protection to all but the plainly incompetent or
24   those who knowingly violate the law." *Malley v. Briggs* (1986) 475 U.S. 335, 341. Defendant
25   Llamas knowingly violated the law when he used excessive force and shot Plaintiff, an
26   unarmed man, Defendants' motion for summary judgment should not be granted.

27       **F.    Mr. Pelayo Can Establish Liability Within the Meaning of *Monell*.**

28

1    A plaintiff may recover from a municipality under 42 U.S.C. § 1983 only if his injury
2 was the result of an official policy, regulation, custom or usage. *Monell v. Department of*
3 *Social Service of New York City* (1978) 436 U.S. 658, 690. Plaintiff must establish "(1) that
4 the plaintiff possessed a constitutional right of which he was deprived; (2) that the
5 municipality had a policy; (3) that this policy amounts to deliberate indifference to the
6 plaintiff's constitutional right; and (4) that the policy is the moving force behind the
7 constitutional violation." *Oviatt by and through Waugh v. Pearce* (9th Cir. 1992) 954 F.2d
8 1470, 1474.

9    As previously discussed, Plaintiff suffered a violation of his constitutional rights as a
10 result of the excessive force Defendant Llamas employed when he shot Plaintiff. Defendant
11 Llamas' actions were unreasonable within the meaning of Fourth Amendment reasonableness
12 standard.

13    In *Monell,* the court provided that, "Local governing bodies, therefore, can be sued
14 directly under section 1983 for monetary, declaratory, or injunctive relief where, as here, the
15 action that is alleged to be unconstitutional implements or executes a policy statement,
16 ordinance, regulation, or decision officially adopted and promulgated by that body's officers."
17 *Monell, supra,* 436 U.S. at 690-91. The court further explained that although the touchstone
18 of the section 1983 action against a government body is an allegation that official policy is
19 responsible for a deprivation of rights protected by the Constitution, local governments, like
20 every other section 1983 "person," may be sued for constitutional deprivations visited
21 pursuant to governmental "custom" even though such a custom has not received formal
22 approval through the body's official decision-making channels.

23    The court emphasized its reasoning by citing from *Adickes v. S.H. Kress & Co.* (1970)
24 398 U.S. 144, 167-168. In *Adickes,* Justice Harlan, writing for the Court, noted that,
25 "Congress included customs and usages [in section 1983] because of the persistent and
26 widespread discriminatory practices of state officials .... Although not authorized by written
27 law, such practices of state officials could well be so permanent and well settled as to
28 constitute a 'custom or usage' with the force of law." *Id.*

1    Thus, it is apparent that municipalities may be held liable for customs, usages or

2    practices that are permanent in the governmental entity, even though such a custom has not

3    received formal approval through the body's official decision-making channels and it not

4    written into its policies.

5    In the instant case, defendants had a policy of deliberate indifference, albeit a tacit

6    understanding amongst the department and not a formal written policy. As such, Plaintiff's

7    claim should not be barred by *Monell.* Supervisors found the shooting was within policy, they

8    allowed Llamas to be interviewed 3 days later because he was tired, that is the policy and

9    conduct complained of - he should have been interviewed that day.

10    Accordingly, defendant's motion for summary judgment should be denied.

11

## IV.    CONCLUSION

13    Based on the foregoing, Plaintiff respectfully requests that the court deny defendants'

14    motion for summary judgment and/or summary adjudication of issues.

15    DATED: June 18, 2008                LAW OFFICES OF PETER GOLDSTEIN

16

17

18

19

20    Peter Goldstein
      Attorney for Plaintiff
21    PETER EUGENE PELAYO, JR.

22

23

24

25

26

27

28